# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2015-KA-01839-SCT

**KELVIN D. ASHFORD a/k/a KELVIN ASHFORD**
**a/k/a BOOMAN**

**v.**

**STATE OF MISSISSIPPI**

| | |
|---|---|
| DATE OF JUDGMENT: | 10/27/2015 |
| TRIAL JUDGE: | HON. GERALD W. CHATHAM, SR. |
| TRIAL COURT ATTORNEYS: | HELEN BAGWELL KELLY |
| | RHONDA MASON AMIS |
| COURT FROM WHICH APPEALED: | TATE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | JOHN KEITH PERRY, JR. |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: ALICIA MARIE AINSWORTH |
| DISTRICT ATTORNEY: | JOHN W. CHAMPION |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 06/08/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE RANDOLPH, P.J., KING AND BEAM, JJ.**

**RANDOLPH, PRESIDING JUSTICE, FOR THE COURT:**

¶1. Kelvin Ashford was indicted, tried, and found guilty by a Tate County jury on eight counts of sexual battery and two counts of fondling. Aggrieved by the judgment of conviction and resulting sentence, Ashford appeals. Finding no error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.    According to N.W.,[1] her aunt, Marjorie Willie, had an on-again, off-again relationship with Kelvin Ashford[2] for N.W.'s entire life. N.W. and Marjorie were close, they saw each other almost every day, and N.W. considered Ashford to be like an uncle. N.W. testified that the first time anything happened between her and Ashford was in March or April of 2007, when she was nine years old. Ashford lay in bed with N.W., but nothing happened that first day. However, Ashford kept trying to touch N.W. For four to six months, she ran from him, but eventually she got tired of running. Ashford began touching her inappropriately in her private areas, and he did so for four to five years straight (from ages nine to fourteen).

¶3.    In fifty pages of trial testimony, N.W. described in detail the sexual acts that Ashford forced her to perform during the four-to-five-year span, including numerous acts of vaginal intercourse, sodomy, fellatio, and cunnilingus.[3] When asked how often these acts would take place, N.W. replied that it depended on how often she went to her aunt's house or how often Ashford came to N.W.'s house. Some weeks, it was every day. Ashford regularly babysat N.W. and her brother, along with Marjorie's children, while Marjorie and N.W.'s mother (Marionette[4]) were working.

---

[1] Initials will be used in place of the child-victim's full name. N.W. was seventeen years old at the time of trial.

[2] Ashford is often referred to throughout the record by his nickname, "Booman."

[3] Given the specific nature of this case and the age of the victim, suffice it to say that we have thoroughly reviewed the record, which discloses that the jury heard evidence that Ashford took liberties against this young lady encompassing multiple types of sexual abuse.

[4] Marionette is often referred to throughout the record by her nickname, "Nikki."

2

¶4.     N.W. testified she did not tell anyone earlier because she did not want to experience the stress of a trial again like she experienced when she was six.[5] On May 7, 2012—when N.W. was fourteen years old—she left a note for her mother on the refrigerator. The note informed Marionette that the reason N.W. had been behaving badly was because what happened to her a long time ago had happened again, and it started three years after the first time. After leaving the note, N.W. finally told her mother that Ashford had been abusing her. They went to the hospital, where N.W. tested positive for a sexually transmitted disease (STD). N.W. testified that she was not otherwise sexually active at the time, so Ashford had to be the person from whom she contracted the disease. N.W. then identified a statement she had given previously to Detective Lisa Sanders, which was admitted into evidence without objection after N.W. testified that the events were clearer in her mind at the time she wrote the statement than they were at the time of trial. In the statement, N.W. claimed she was sexually abused by Ashford more than one hundred times, that he had done "sexual thing[s]" to her since she was nine years old. N.W. was asked if she was lying about Ashford because she really caught the STD from her boyfriend. She said no, that she and her boyfriend were not sexually active.

¶5.     On cross-examination, defense counsel referenced the statement and asked N.W. what she and Ashford had done "a hundred times," to which N.W. again described multiple sexual acts Ashford had committed against her or forced her to perform. N.W. described a time when Ashford sexually assaulted her in the bed while Marjorie slept beside her. N.W. tried

---

[5]N.W. had been molested by another individual when she was six years old.

to wake her aunt to no avail: "I bumped her and didn't wake up, so. . . I patted her. She didn't wake up." N.W. testified it was not uncommon for the children to sleep with Marjorie on occasion. When asked where the various incidents took place, N.W. responded wherever and whenever Ashford decided. She testified the last time Ashford did anything to her was two to three months before she wrote the letter in May 2012. After the last incident, Ashford began working with N.W.'s grandfather and was not at home as often. Finally, defense counsel asked N.W. to describe Ashford's penis. She did: "The top part of his penis has a—a—I'd say a bump, mole on top of it. It has hair around it." Defense counsel then abandoned that line of questioning.

¶6.     Marionette testified that she and Marjorie were close, that they saw each other regularly. She identified Ashford as Marjorie's long-time boyfriend who used to keep her children, including N.W., every day. She testified that after she read the note from N.W., she took her to the hospital where she was diagnosed with trichomoniasis, an STD. When Marionette informed Ashford about the allegations, he denied being with N.W. Marionette testified that she saw Ashford almost every day, that sometimes he stayed with her when he was angry with Marjorie. He also sometimes stayed with his mother or with another woman.

¶7.     The State then called Detective Lisa Sanders, who testified that, when she arrived at the hospital while N.W. was getting tested, Marionette was on the phone with Ashford. Sanders had Marionette put Ashford on speaker phone while Sanders prompted Marionette on what to say. After repeatedly denying ever being with N.W., Ashford stated he would help take care of the baby if N.W. was pregnant, "just out of kindness." Sanders testified he even

4

agreed to pay for an abortion. Ashford said he would submit to a DNA test but did not want the police involved. Four days later, Ashford went to the police station and, after signing an acknowledgment of rights form, gave a videorecorded statement to Sanders.[6] In the video, Ashford stated he had been with Marjorie off-and-on for about fourteen years. He denied doing anything sexual with N.W., stating she never even walked in on him while he was in the bathroom or getting dressed. When told about N.W. having an STD, Ashford said he was supposed to get tested too as part of the hiring process at North Oak Hospital where he was trying to get a job. Sanders identified Exhibit 2 as the statement she took from N.W. She also testified that she had checked, and STD testing was not part of the hiring process at the hospital—that they check for only drugs and narcotics. On cross-examination, Sanders admitted that she had never asked Ashford to submit to any DNA or STD testing.

¶8.     Next, the State called Dr. Olufemi Adeleye—the physician who treated N.W. at the hospital—as an expert regarding the examination, bloodwork, and results. On May 7, 2012, N.W.'s chief complaint was a vaginal discharge. She told the doctor she was molested two to three months back, that she was fourteen, and that she had been molested since age nine. Dr. Adeleye diagnosed N.W. with trichomoniasis, a disease that is spread only through sexual intercourse. He testified that trichomoniasis is treated with a single dose of medication, which is how N.W. was treated. According to Dr. Adeleye's testimony, one dose cures the patient. On cross-examination, Dr. Adeleye testified that he had never tested or treated Ashford for an STD, but that he could have been treated elsewhere.

---

        [6]The video was admitted into evidence without objection as Exhibit 5 and was played to the jury.

¶9.    Marjorie testified that she had dated Ashford off-and-on for ten to fifteen years and that he lived with her during that time. She testified that N.W. came to her house often, that she sometimes spent the night, and that she sometimes slept in the bed with Marjorie and Ashford. Marjorie stated she is a heavy sleeper and that it would be hard to wake her. She testified that in May 2012, she and Ashford were not having a sexual relationship "because of his infidelities." When Marjorie told Ashford by phone about N.W.'s allegations, he was not home. He said he would come by but he never returned. He left all of his belongings in Marjorie's house. According to Marjorie, Ashford did not work during the time he and she were together until the last six months, when he started working with her father. When asked if she felt like she needed to get tested after the allegations came out, Marjorie said, "No . . . because me and Kelvin Ashford wasn't sexually active; so why should I get tested?" On cross-exaination, Marjorie stated she and Ashford began having a sexual relationship when she was seventeen (sometime in 1998), but that he did not begin staying with her until 2008. She again stated that Ashford did not have a job between 2008 and 2012. If Ashford worked for hospice during the times he would visit his grandfather, Marjorie stated she did not know it. Marjorie also confirmed she knew Ashford was seeing other women during the time they were together. She also testified that it was not uncommon for N.W. to stay with her every night of the week during 2008-2010. Finally, Marjorie testified that the last time she had sex with Ashford was the middle of April 2012, two to three weeks before the allegations came out, and that she did not get tested for STDs. On redirect, Marjorie stated there were times when Ashford stayed with another woman or with his father, but that it was only a couple of

6

periods of four-to-five-days' duration. Marjorie did not find it impossible that Ashford had sexually assaulted N.W. with Marjorie asleep in the bed because there were times when all three of them were in the bed and Marjorie is a heavy sleeper.

¶10. Sonya Graham, the chief executive officer of North Oak Hospital, testified that there was no record of Ashford applying for a job at the hospital and that STD testing is not part of the hiring process. The hospital tests potential employees only for tuberculosis, rubella, and drugs. On cross-examination, she agreed with defense counsel that Ashford may have gotten an application and just never turned it in, to explain the lack of record.

¶11. N.W.'s other aunt, Jessica Willie, testified that Ashford and Marjorie started living together in either 2008 or 2009. She stated anytime her family got together for a function, Ashford was always there. According to her, Ashford did not work, so he stayed home cooking, cleaning, and taking care of all the children. Jessica described a time when she walked in on N.W. and Ashford laying in the bed in a "spooning" position, but on top of the covers, with space between and wearing clothes. She told Marionette and Marjorie about the incident, but they told her to leave it alone, that they did not think anything was going on.

¶12. N.W.'s grandfather, Willie Willie, testified that when Marjorie was dating Ashford, he saw Ashford nearly every day. Willie stated Jessica also told him about the incident in the bed, but that he disregarded it as well because Jessica "likes to keep confusing and deviling going."[7] Willie got Ashford a job in 2012 with a mowing service. Ashford never returned to

---

[7]Marionette likewise had testified earlier that Jessica "like[s] to keep up messing; so we didn't believe her." She confirmed that "keep up messing" meant "trying to stir something up."

work after May 7, 2012. Willie admitted on cross-examination that he had made several statements that could been seen as death threats toward Ashford to explain why he never retrieved his belongings or returned to work. Willie also testified that Ashford moved in with Marjorie three to four years before the allegations came out in 2012.

¶13.   At this point, the State rested. The defense moved for a directed verdict, arguing the State had failed to meet its burden of proof. That motion was overruled.

¶14.   The defense's first witness was Ruby Tate, Ashford's mother. She testified that Ashford had stayed with her in 2007 and that all his belongings were at her house. Ashford had stayed with her the first four-to-six months of 2008 because she had been recovering from a heart attack. In June 2009, Ashford began staying with his grandfather some because his grandfather had Parkinson's and Alzheimer's Diseases, but he continued his residence at Ruby's. According to Ruby, Ashford dated Shirley Mabrey for two years beginning in 2007. He then dated Tina Gardner off and on for about two years. Ruby first heard Marjorie's name in 2009 or 2010 when Ashford began spending the night at Marjorie's. Ruby testified Ashford stayed with another girlfriend, a different Tina, from 2010 to 2012. Ruby was asked if Ashford worked between 2007 and 2012. She responded that he worked for hospice and a lawn service. But she testified he worked for hospice for only about six months. While he was working with hospice, he stayed with his grandfather during the day and returned to Ruby's at night "every day." She testified he worked in lawn service during the summers of 2010 and 2011.

¶15. Next, Ashford's aunt, Gail Hawkins, testified that from sometime in 2007 to sometime in 2008, Ashford was in and out, helping take care of her father, who suffered from Parkinson's and Alzheimer's. Ashford sometimes sat with him during the day, sometimes at night, just whenever he was needed. Gail testified that most nights, Ashford stayed with her helping take care of her father. During the day he was "in and out, back and forth." Gail stated she had seen Marjorie, Kelvin, and the children together at Walmart on occasion, but that to her knowledge, he had continued living with Ruby.

¶16. Ashford's sister, Crystal Burton, testified he dated Mabrey until 2008, followed by Tina Gardner and Tina Draper. She said he dated Marjorie as well, but that it was just an "occasional relationship." He dated Gardner for two years and then dated Draper and Marjorie at the same time. According to Crystal, Ashford worked with hospice in 2007 keeping their grandfather and at some point worked in construction with Tony Jones. Crystal said she knew the Willies very well, that the children called her Aunt Crystal, but that Ashford never had stayed with Marjorie. Crystal testified that Marjorie had told her Marjorie was going to get tested for STDs. According to Crystal, Marjorie had told her that she went to the health department and "didn't have anything." On cross-examination, Crystal stated she never told law enforcement officials about Marjorie saying she had tested negative for STDs because no one had asked. However, she claimed she told defense counsel back in 2012 when Ashford first sought representation.

¶17. The defense then called Tina Draper, who testified that she had dated Ashford from April 2010 to August 2012. During that time, Ashford typically stayed with Ruby during the

9

week and with Draper on the weekends. Occasionally, Draper would pick up Ashford at Marjorie's house. Draper testified that she and Ashford were sexually active during that time but that she never had an STD and never knew Ashford to have one. During the time they dated, Draper knew Ashford worked for a lawn service. Draper testified she sometimes picked up Ashford at Marjorie's because he kept the children there. Draper said she was sexually active only with Ashford and that she tested negative for STDs in July 2012.

¶18. Finally, Ashford testified in his own defense. According to Ashford, he was living with Ruby in 2007 until late 2010 when he began living with Draper. He denied ever staying continuously with Marjorie. However, he admitted to staying at Marjorie's during the week in 2011 and 2012 because it was closer and more convenient for him to get to work from Marjorie's. During that time, he was working seasonally for the lawn service. Ashford testified that on May 7, 2012, he had gone with one of Marionette's relatives to get an application at North Oaks Hospital. While there, Marionette called the relative to pick up N.W. from school. The relative left the hospital, picked up N.W. at school, and came back to the hospital to get Ashford. Ashford took the application with him and was dropped off at Marjorie's. A friend picked him up and he left. He was gone when he got the call from Marjorie about N.W.'s allegations. Ashford stayed in Tunica until Crystal told him Detective Sanders wanted to talk to him. He went to the police station and gave a recorded statement. According to Ashford, in the early 2000s, he was working for Metro Foods. Then he went to Lucite International as a forklift operator. After that, he worked in construction for Tony Jones before taking a job at Walmart in Batesville, where he worked in loss-prevention

before being promoted to service manager of the tire and lube express. However, he later testified that, at the time of his arrest on December 19, 2012, he was working at Tri-Lakes Hospital. When he got out on bond, he went to work at Walmart, first in the garden center, then in loss-prevention, and finally as tire and lube service manager.

¶19. Ashford denied having any sexual or inappropriate contact with N.W. He stated Marjorie was easy to wake up. He denied ever sleeping in the same bed with N.W., regardless of whether Marjorie was present or not. He stated he saw N.W. only on holidays, birthdays, and other special occasions. He denied ever having an STD. Ashford testified he never spent any time in 2007, 2008, or 2009 with Marjorie. In 2010, he and Marjorie started talking. Though he was still seeing and staying with Draper, he started going to Marjorie's during the week to be closer to work. According to Ashford, he never volunteered to keep any of the children and was never alone with N.W. However, he did admit to taking Marionette and her children to Le Bonheur and driving back with just N.W. in the car. This occurred in either January or February of 2012, when N.W. was fourteen years old. He denied trying to mess with or touch her in any way or that they were having sex going down the road. On cross-examination, Ashford denied ever being alone with N.W. He admitted that N.W. had spent the night at Marjorie's with Ashford present. He reasserted that he did not see Marjorie until 2010 and that, even then, they were simply "sex partners." He testified he started working for the seasonal lawn service in 2011 and worked in construction as needed for Tony Jones before that. Ashford denied ever agreeing to pay for an abortion but admitted to agreeing to help "in any way possible."

11

¶20.    After Ashford's testimony, the defense rested. Following deliberations, the jury found Ashford guilty on all counts.[8] Ashford then filed a motion on April 28, 2015, for judgment notwithstanding the verdict (JNOV) as to count three or in the alternative, a motion for new trial. In the motion, Ashford alleged that the verdict was not supported by evidence, that it was contrary to the weight of the evidence, and that he had newly discovered evidence that would produce a different result at a new trial. Ashford alleged that, following trial, N.W. posted on Facebook that she had been forced to lie. Two days later, he filed a motion requesting a subpoena duces tecum directed to Facebook to produce Facebook pages belonging to N.W., Marionette, Marjorie, and Jessica.

¶21.    A hearing was held on June 10, 2015, regarding the post-trial motions. At that first post-trial hearing, the trial court granted the motion for a subpoena duces tecum and held the motion for JNOV or new trial in abeyance per Ashford's request. At that hearing, Ashford offered a post he attributed to N.W. "wherein she recants her testimony and says that she was lying." Ashford also claimed to have text messages from Jessica describing a scheme to have him convicted for leaving Marjorie for another woman. According to Ashford's counsel, the Facebook post was provided by some third party to Ashford's wife, who was hospitalized in Tennessee and unable to attend the hearing. The State countered that if questioned, N.W. would deny making the post alluded to by Ashford. In regard to the subpoena requested, the State requested that the subpoena be expanded to include Crystal's Facebook page, for Crystal had acknowledged the existence of fake profiles to create drama between the

_____

[8]Each count described specific acts of sexual battery and fondling at specific ages—the details of which are not necessary to relate in this opinion.

families. That request also was granted. The court granted the subpoena duces tecum in the interest of justice so the evidence could be "properly explored and given whatever value it ought to be given." The subpoena was issued on July 7, 2015.

¶22. Facebook responded to the subpoena duces tecum by letter dated July 16, 2015, informing defense counsel that the Stored Communications Act[9] exempted it from state subpoena powers. In the same correspondence, Facebook informed her of two alternative means of retrieving the information sought: (1) subpoena the information directly from the individual users or (2) work with the prosecutor to secure a search warrant. Ashford chose to issue subpoenas directly to Marjorie, Jessica, Marionette, and N.W. The trial court granted that request on October 7, 2015. The respondents were to produce the requested pages to the court on October 16, 2015.

¶23. At the October 16 hearing, Ashford's counsel acknowledged receipt of the information requested in the motion for subpoenas duces tecum from everyone except N.W. The State informed the court that N.W.'s Facebook pages had been placed in the court file. When those pages could not be found in the court file, the State provided Ashford a printout of N.W.'s Facebook page that Detective Sanders had obtained voluntarily from N.W. after Ashford filed his first motion for JNOV or new trial on April 28, 2015. The State had N.W. review the pages produced by Detective Sanders to determine if they were identical to those N.W. had brought to the court that day and that N.W. would testify that they were identical. Defense counsel took issue with those pages. The court specifically asked N.W. if she had

---

[9] 18 U.S.C. § 2701, *et seq.*

brought her pages to court that day. She said she did, and she had given them either to Sanders or to the prosecutor. The court then inquired of the prosecutor what she had done with N.W.'s pages. She replied that she had furnished N.W.'s pages to the sheriff at Ashford's counsel's request. Ashford's counsel confirmed the State's version of events.

¶24.    No further action was taken that day other than setting Ashford's sentencing hearing for October 27—eleven days later. The court unequivocally stated that the 27th was for sentencing only and imposed an October 20 deadline for filing any other matters. No other motions or matters were brought to the court's attention by the October 20 deadline.

¶25.    On the 27th, the court opened the hearing by stating,

> The last time we were here, which I believe was October 16, the court announced that all discovery or any other matters pertaining to this case would be brought on or before the 20th. Nothing's been brought to my attention by the 20th, so the court is ready for sentencing.

The State announced ready. Ashford's counsel responded to the court that she had filed a motion to withdraw on the 21st (after the 20th deadline) because a dispute had arisen between her and Ashford on that date and that Ashford was unwilling to take her advice any longer. Particularly, counsel stated that had she known that the situation would arise, she would have filed it on the 20th, "but it didn't arise before the 21st." The court denied the motion to withdraw and instructed the State to proceed:

[The State]:    I didn't know if [defense counsel] was going to go through her post-trial motions first, Your Honor.

The Court:    I announced the other day that we would have sentencing today.

[The State]:    Yes, sir.

14

The Court:    That's all I'm going to hear today is sentencing. I'm not going to hear post-trial motions. I'm not going to hear any other motions. I'm not going to hear anything but sentencing.

[The State]:    Yes, sir.

The Court:    I set a date. I meant what I said last time. All right.

[The State]:    Will the Court entertain witnesses, Your Honor, or just argument?

The Court:    I'll allow witnesses if it pertains to sentencing.

¶26.    The State called N.W., who testified her trial testimony was true, that she had not recanted her trial testimony, and that she had not posted anything on Facebook about lying during trial. When questioned regarding the impact of Ashford's crimes on her as the victim, she explained to the court that she was being ridiculed at school, that she feared men, and that she felt "worthless" as a result of what Ashford had done to her. She requested he receive the maximum penalty. On cross-examination, N.W. identified Facebook printouts without the alleged recantation as her pages, and denied posting what Ashford claimed she had.[10] N.W. further maintained that Ashford did not work when he was seeing Marjorie in 2007. On cross-examination, defense counsel had her review a document purportedly

_____

[10]The post at issue allegedly read:

I don't care what happen to me. I hate this other person inside of me. I am tired of all the nightmares an no sleep because I were made to lie. I am mad at jessica for posting stuff. This is not about me it about her. No one listen. I didnt want to go to court and lie on booman. I was happy it got thrown out at first because I didnt want people talking about me.Jessica fault. I just want some peace. Yall are the one who make me want to hurt myself. I ask jessica to take it down but she wont

Sentencing Exhibit 2 (errors in original).

15

showing that Ashford had worked for or through Select Staffing from December 6, 2006, to January 7, 2008.[11] On redirect, the State presented N.W. with printouts containing the same text identified in footnote 10 but with different pictures and different picture locations. N.W. agreed that, while she was the person in the pictures, those printouts were not from her Facebook page. She testified she had seen three other accounts purporting to be hers, but she did not create or post any of them. N.W. also pointed out that when she typed a person's name in Facebook that she was friends with, Facebook would automatically bold that person's name. N.W. stated she was friends with Jessica on Facebook. However, in the disputed posts containing the text identified in footnote 10, Jessica's name was not bolded.

¶27.    Marionette testified that at some point, she received a phone call from someone identifying herself as Amanda Bailey, claiming to be from the district attorney's office, and requesting N.W.'s Facebook information, age, and teachers' names. She claimed she did not know an Amanda Bailey, did not know if she worked at the district attorney's office, and did not check to see if she worked there.[12] With that, the State rested.

¶28.    Ashford countered with his sister, Crystal Burton. Crystal testified that Ashford had resided with Marjorie off-and-on, but she did not know the actual length of time. She also stated Ashford worked off-and-on at Walmart, doing landscaping, and with Tony Jones. She did not recall him being with Select Staffing. While he worked with hospice with their

---

[11]The State objected based on relevance and was overruled. Then the State objected based on authenticity, which went unanswered. The document was not entered into evidence and is not in the record.

[12]Marionette did not say whether she gave the person N.W.'s information.

16

grandfather, he was staying some with the grandfather, some with Ruby, and some with Marjorie. She then testified to seeing the contested recantation post on Facebook. She also stated that an envelope was left on her car two days after trial containing an anonymous note which described a scheme to get Ashford convicted because he was cheating on Marjorie. Also contained in the envelope was a photocopy of a phone open to text messages implying that Ashford may be innocent "but no one will ever know." The messages also stated "[t]hat mf playboy won't hurt my sis again." Crystal believed the phone number the messages came from belonged to Jessica because the number matched the one Jessica posted as her phone number on Facebook.

¶29.    Crystal testified she gave the packet to defense counsel two days after receiving it, but that she had no idea where it came from or whose phone was depicted in the photocopy. She stated she took the documents to Detective Sanders the week before the sentencing hearing to try and get them fingerprinted. According to Crystal, defense counsel was supposed to be trying to get the phone records from the number in the photos. On cross-examination, it was pointed out that there were no reply messages in the text chain. Crystal stated  she believed the person who owned the phone had deleted their messages before copying. Crystal admitted to posting on Facebook an acknowledgment that someone had created a fake profile "to keep up drama." Again, Ashford's wife allegedly was ill and unavailable to testify as to how she first acquired the contested recantation post.

¶30.    Just before defense counsel began to redirect Crystal, the court interjected:

Y'all would do me a great service if y'all would get off all this Facebook stuff. I don't know what good it's doing. This is not a motion for a new trial. This

17

is not a motion to set aside a verdict. I don't know where we're going with all this, but y'all would service me greatly if you would go on and get off this Facebook.

The defense rested.

¶31. The trial court sentenced Ashford to twenty years each on counts one through four and six through nine, and five years each on counts five and ten. The sentence for count five was to run consecutively to count one. All other sentences ran concurrently. The court denied Ashford's post-trial motions. Subsequently, by agreed order, Ashford received substituted trial counsel, who also filed a new motion for JNOV or, in the alternative, motion for new trial. That motion likewise was denied. Ashford appealed.

## ISSUES

¶32. Ashford raises the following issues on appeal, which have been restated for clarity:

I. Whether the trial court erred in its consideration of the evidence Ashford sought to present during post-trial hearings.

II. Whether the evidence presented at trial was sufficient to support the verdict.

III. Whether the verdict was against the overwhelming weight of the evidence.

IV. Whether Ashford received ineffective assistance of counsel.

## ANALYSIS

I. Whether the trial court erred in its consideration of the evidence Ashford sought to present during post-trial hearings.

¶33. We review a trial court's denial of a motion for new trial based on newly discovered evidence for an abuse of discretion. *Moore v. State*, 508 So. 2d 666, 668-69 (Miss. 1987).

18

> If perjury was committed, the defendant will be entitled to a new trial only if four factors are met. First, it must appear that the perjured testimony will probably change the result if a new trial is granted. Second, the perjury must have been discovered after the trial. Third, the perjury must not have been discoverable before the trial by the exercise of due diligence. Fourth, the perjury must be on an issue that is material to the case and not be merely cumulative or impeaching.

***Brown v. State***, 890 So. 2d 901, 917 (Miss. 2004).

¶34. Ashford argues the trial court abused its discretion when it failed to consider evidence that N.W. committed perjury and takes issue with the language used by the trial court in its order. Specifically, the order reads as follows:

> This day this matter came on for hearing upon the Defendant's Motion for J.N.O.V. or, in the Alternative, Motion for New Trial in the above styled and numbered cause; and the Court, after hearing argument of counsel, and being fully advised in the premises, is of the opinion that said motion is not well taken and should be overruled.

Ashford argues that, because defense counsel was cut off from presenting further Facebook evidence during the sentencing hearing, the trial court did not in fact hear argument of counsel and was not fully advised in the premises. According to Ashford, the trial court denied his motion based on a partial presentation of the evidence and thus abused its discretion.

¶35. We find the trial court based its ruling on the evidence received throughout the proceedings, up to and including all filings and argument presented to the court on or before the October 20, 2015, deadline. The court was explicit that the hearing on October 27 was a sentencing hearing. The court gave the parties until October 20 to file any additional motions or bring any other matters to the court's attention. Furthermore, defense counsel's

statement that she would have presented her motion to withdraw by the twentieth had the issue arisen in time further evidences her understanding that all nonsentencing matters were due on or before October 20, 2015. At the hearing on the twenty-seventh, the court again made clear that it was there for sentencing and sentencing only. The court gave counsel for both sides considerable leeway when they began introducing evidence of Facebook and alleged recantation. In time, however, the court reminded the attorneys that they were not there arguing a motion for a new trial or to set aside the verdict and that it did not see how the Facebook evidence was relevant to sentencing.

¶36. Prior to October 20, the trial court had been provided a copy of the alleged recantation post and a copy of Marjorie's, Jessica's, Marionette's, and N.W.'s Facebook pages.[13] At the prior hearing on June 10, the court had been informed that N.W. would deny making the alleged recantation statement and that Crystal, Ashford's sister, had knowledge of fake Facebook pages being created to "continue an ongoing drama between these two families."

¶37. Throughout these proceedings, the court was informed that N.W. had denied creating the posts averred by Ashford to be the basis for his motion for a new trial. Thus, the trial court did not err in denying Ashford's motion for a new trial based on newly discovered evidence. Whether based on the information before the court by the October 20 deadline, or including that which was developed at the October 27 sentencing hearing (there being no substantive difference), Ashford never established any newly discovered evidence. We cannot say that the result would be different if a new trial were granted. *See **Brown***, 890 So.

---

[13]The subpoenas directed the pages to be delivered to the trial court. The court was in possession of the pages at the post-trial-motion hearing on October 16.

2d at 917; *see also **Howell v. State***, 989 So. 2d 372, 384 (Miss. 2008) ("As a general rule, recanted testimony is exceedingly unreliable, and is regarded with suspicion; and it is the right and duty of the court to deny a new trial where it is not satisfied that such testimony is true."). Here, no recanted testimony was established.

¶38.    As to Ashford's argument that the trial court had erred in enforcing the October 20 deadline, this Court affirmed a trial court's ability and authority to enforce known deadlines: "It may be that people will miss fewer trains if they know the engineer will leave without them rather than delay even a few seconds. . . . At some point the train must leave." ***Bowie v. Montfort Jones Mem'l Hosp.***, 861 So. 2d 1037, 1042 (Miss. 2003) (quoting ***Guaranty Nat'l Ins. Co. v. Pittman***, 501 So. 2d 377, 388-89 (Miss. 1987)). While the Court was addressing enforcement of scheduling orders, the language is aptly suited to the case at bar.

II.    Whether the evidence presented at trial was sufficient to support the verdict.

¶39.    We review challenges to the legal sufficiency of the evidence *de novo*. ***Brooks v. State***, 203 So. 3d 1134, 1137 (Miss. 2016). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ***Id.***

¶40.    Ashford argues the State failed to prove that he penetrated N.W.'s vagina as charged in counts one and six. As to counts seven through ten, he argues the State failed to prove he fondled or sexually battered N.W. while she was fourteen years old. And regarding count nine, Ashford further argues the State failed to prove he had performed oral sex on N.W.

21

¶41. Slight penetration of the vulva or labia is sufficient to constitute penetration. *Bateman v. State*, 125 So. 3d 616, 623 (Miss. 2013). The jury received evidence detailing the sexual acts Ashford committed against N.W. or forced her to perform. Her testimony was supported by her prior statement to Detective Sanders, which was admitted into evidence without objection. The record contains more than sufficient evidence to dispel the defendant's argument and supports his convictions. In addition to her description of the sexual acts, N.W. stated the last time she and Ashford had sexual contact was two to three months prior to her May 7, 2012, statement. As further evidence of vaginal penetration, N.W. was diagnosed with an STD that caused her to have a vaginal discharge. She testified the only person with whom she was sexually active was Ashford. Dr. Adeleye testified the STD could be transferred only through sexual intercourse.

¶42. N.W. testified Ashford first started touching and sexually abusing her when she was nine years old, and that the abuse had continued for four to five years straight, from ages nine to fourteen. She said he had touched her with his hand and his penis, and that he had kissed her vagina. In her statement, N.W. indicated the last time she and Ashford were sexually active was two to three months prior to May 2012, which would have occurred during a time when N.W. was fourteen years old.[14] In addition to testifying that the acts occurred continuously from the time she was nine to fourteen years old, she also stated she and Ashford had had some sexual contact together more than a hundred times. N.W. alleged she

---

[14]N.W. turned fourteen on January 20, 2012.

22

and Ashford had some sexual contact in a car going down the road. And Ashford admitted to being in the car alone with N.W. in either January or February of 2012.

¶43. We find that, viewing the evidence in the light most favorable to the verdict, the verdict was supported by substantial evidence.

> III. Whether the verdict was against the overwhelming weight of the evidence.

¶44. We review the denial of a motion for a new trial based on an objection to the weight of the evidence for an abuse of discretion and "will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." ***Kirk v. State***, 160 So. 3d 685, 697 (Miss. 2015).

¶45. Ashford argues N.W.'s version of events was simply incredible. For one, he asserts it cannot be believed that he had sex with N.W. while Marjorie and two other children were in the bed with them, nor that he sexually assaulted her in every room of the house while people were present. Second, he finds it preposterous that he committed sexual acts against N.W. every single day from 2007 through March or April of 2012. He also argues N.W.'s testimony that he did not work was contradicted by his trial witnesses. Finally, he argues the fact that Marjorie and Draper did not contract an STD from him belies N.W.'s allegations.

¶46. Ashford mischaracterizes N.W.'s testimony. When describing the incident in which Ashford sexually assaulted N.W. while Marjorie also was in the bed, N.W. never said any other people were in the bed with them. She did say that, on occasion, the other children slept in the bed with Marjorie as well. Marjorie confirmed that sometimes the other children slept with her, and that there were times when she, N.W., and Ashford slept in the bed together.

23

While Ashford testified Marjorie was easy to awaken, both N.W. and Marjorie testified she was a heavy sleeper. N.W. said she patted and bumped Marjorie but she did not wake up. Marjorie stated she would be hard to wake up. According to N.W.'s testimony, sometimes there were people in other parts of the house while Ashford was sexually abusing her; sometimes it was just the two of them. But when people were present, they were in other parts of the house or outside playing.

¶47.    Nor do we understand N.W.'s testimony to be that Ashford abused her every single day. She stated he committed sexual acts against her more than a hundred times— considerably less than every day for four to five years. We read N.W.'s testimony to be that Ashford committed the acts every chance he had—when he was around N.W. and when the opportunity presented itself. As to his work history, all agreed that Ashford worked for a seasonal lawn service in 2011 and 2012. Ashford's witnesses testified he worked in hospice for about six months in 2008, but even his own mother remembered him working for hospice and the lawn service only between 2007 and 2012.

¶48.    Crystal, Ashford's sister, said that Marjorie said she had gotten tested and was negative. However, Marjorie testified that she never got tested. Draper did not testify as to the last time she and Ashford had sex but stated she got tested in July 2012. Dr. Adeleye testified that the STD could be treated and cured with a single dose of medication. Though Adeleye did not treat Ashford, he testified he easily could have been treated elsewhere.

¶49.    The crux of Ashford's weight-of-the-evidence argument hinges on witness credibility. "This Court has also held that it is in the province of the jury to determine the credibility of

witnesses. Any questions regarding the weight and worth of witness testimony or witness credibility are for the jury to resolve." ***Williams v. State***, 757 So. 2d 953, 957 (Miss. 1999) (internal citations omitted). Viewed in the light most favorable to the verdict, the evidence does not preponderate so heavily against the verdict that to allow it to stand would sanction an unconscionable result.

IV.     Whether Ashford received ineffective assistance of counsel.

¶50.    To succeed on an ineffective-assistance-of-counsel claim, the defendant must show that (1) his counsel's performance was deficient, and (2) this deficiency prejudiced his defense. ***Pucket v. State***, 879 So. 2d 920, 935 (Miss. 2004) (citing ***Strickland v. Washington***, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). "There is a strong but rebuttable presumption that trial counsel was competent and performed within the wide range of reasonable conduct expected from counsel." ***Wilson v. State***, 194 So. 3d 855, 862 (Miss. 2016). The burden is on the petitioner to rebut the presumption by showing that counsel's performance did not meet the constitutional standard established in ***Strickland***. ***Id.***

¶51.    Ashford alleges his trial counsel provided ineffective assistance by (1) failing to investigate newly discovered evidence after trial, (2) failing to present testimony of Ashford's work history during trial, (3) failing to present evidence on post-trial motions by the October 20 deadline, and (4) eliciting damaging testimony on N.W.'s cross-examination. Ashford argues defense counsel's failure to obtain search warrants to get posts from Facebook and the phone records of the phone number that purportedly sent text messages concerning a scheme to get Ashford convicted was constitutionally deficient performance.

25

According to Ashford, counsel's decision "prejudicially affected the outcome of his post-trial motions as a whole, by wholly eliminating his opportunity to present possibly exculpatory evidence."

¶52.    These claims are without merit. Ashford claims the text messages came from Jessica. At the sentencing hearing, Crystal testified she knew the number was Jessica's because it matched her phone number on Facebook. There was no evidence or testimony to the contrary. At the same time, trial testimony established that Jessica had a reputation for causing drama and stirring up trouble. As for counsel's failure to secure a search warrant for Facebook, Facebook's counsel informed defense counsel that she could either secure a search warrant for the corporate office or subpoena the records from the individual users. Defense counsel chose the latter option. Facebook provided Ashford's counsel with two options to obtain the information. She chose one of those options. We find counsel's decision did not amount to deficient performance, nor has Ashford shown the prejudice required by *Strickland*.

¶53.    Ashford argues defense counsel should have presented the Select Staffing documents during trial instead of waiting until the sentencing hearing.  Had the documents of which Ashford now complains been admitted into evidence, they offer no probative or relevant information which would exonerate him from the crimes for which he was convicted. Other testimony reveals large gaps of undisputed, long-term unemployment. Counsel's failure to present the Select Staffing documents during trial does not establish ineffective assistance.

¶54.    To the extent Ashford argues counsel's failure to present additional evidence to the trial court by the October 20, 2015, deadline was ineffective assistance, neither the deficient-performance nor the prejudice prong has been satisfied. As discussed in Issue I, N.W. denied posting a recantation. Furthermore, the State presented evidence that fake profiles of N.W. existed. Ashford failed to offer "newly discovered evidence" sufficient to warrant the granting of a new trial. He offered no substantive evidence to support a claim of newly discovered evidence. The trial court conducted three separate post-trial hearings—culminating in a sentencing hearing. At the first hearing, defense counsel and the trial court had been informed that N.W. would deny making the post in which she allegedly recanted her trial testimony. N.W. was available to testify to that effect.[15] Thus, defense counsel knew that the post would, at best, serve only to contest N.W.'s testimony. At the second hearing, not only were N.W.'s original Facebook pages provided to Ashford by the State through Detective Sanders, Ashford also received Facebook pages from Jessica, Marionette, and Marjorie. The court gave Ashford an additional four days to review the documents and to file any additional motions. We find defense counsel's decision not to continue pursuing a new trial based on a disputed recantation post—soundly denied by the alleged recanter—does not amount to ineffective assistance of counsel. *See Liddell v. State*, 7 So. 3d 217, 219-20 (Miss. 2009) ("In considering a claim of ineffective assistance of counsel, an appellate court must strongly presume that counsel's conduct falls within a wide

_____

[15]At the sentencing hearing, N.W. testified that she did not create the post.

27

range of reasonable professional assistance, and the challenged act or omission might be considered sound trial strategy. In other words, defense counsel is presumed competent.").

¶55. Finally, Ashford argues defense counsel's cross-examination of N.W. amounted to ineffective assistance of counsel by establishing the only evidence in the record that pointed to vaginal penetration and age. Particularly, Ashford faults defense counsel for asking N.W. to describe his penis without asking Ashford to confirm or deny that description.

¶56. However, during cross-examination, counsel essentially questioned N.W. line-by-line on her statement to Detective Sanders, which already had been admitted into evidence. Thus, that part of the cross-examination did not add anything that was not already before the jury. Ashford repeatedly denied having any sexual contact with N.W. and stated she never saw him naked. If that were so, N.W. would not have been able to describe his penis when asked by defense counsel. But she did. Ashford faults defense counsel for not asking him to confirm or deny that description. Yet he fails to tell this Court how his description would differ from that given by N.W. Not knowing what his answer to that question would be, we cannot say that counsel's actions prejudiced his defense.[16]

## CONCLUSION

¶57. For the reasons stated, we find Ashford's claims of error are without merit. The judgment and sentences of the Tate County Circuit Court are affirmed.

¶58. **COUNT I: CONVICTION OF SEXUAL BATTERY OF A CHILD UNDER THE AGE OF FOURTEEN (14) AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS,**

---

[16]As we find no errors, any claim by Ashford of cumulative error is without merit. *See Harris v. State*, 970 So. 2d 151, 157 (Miss. 2007).

28

**AFFIRMED. COUNT II: CONVICTION OF SEXUAL BATTERY OF A CHILD UNDER THE AGE OF FOURTEEN (14) AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT III: CONVICTION OF SEXUAL BATTERY OF A CHILD UNDER THE AGE OF FOURTEEN (14) AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT IV: CONVICTION OF SEXUAL BATTERY OF A CHILD UNDER THE AGE OF FOURTEEN (14) AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT V: CONVICTION OF FONDLING AND SENTENCE OF FIVE (5) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT VI: CONVICTION OF SEXUAL BATTERY OF A CHILD AT LEAST FOURTEEN (14) BUT UNDER SIXTEEN (16) YEARS OF AGE AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT VII: CONVICTION OF SEXUAL BATTERY OF A CHILD AT LEAST FOURTEEN (14) BUT UNDER SIXTEEN (16) YEARS OF AGE AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT VIII: CONVICTION OF SEXUAL BATTERY OF A CHILD AT LEAST FOURTEEN (14) BUT UNDER SIXTEEN (16) YEARS OF AGE AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT IX: CONVICTION OF SEXUAL BATTERY OF A CHILD AT LEAST FOURTEEN (14) BUT UNDER SIXTEEN (16) YEARS OF AGE AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT X: CONVICTION OF FONDLING AND SENTENCE OF FIVE (5) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. SENTENCES IN COUNTS II, III, IV, VI, VII, VIII, IX, AND X ARE TO BE SERVED CONCURRENTLY WITH SENTENCE IN COUNT I. SENTENCE IN COUNT V IS TO BE SERVED CONSECUTIVELY TO SENTENCE IN COUNT I. SENTENCES IN VIII AND X ARE TO BE SERVED CONCURRENTLY WITH SENTENCE IN COUNT V. IN COUNT I, APPELLANT SHALL PAY $1,000 TO THE MISSISSIPPI CHILDREN'S TRUST FUND, $1,000 FINE, $200 TO THE DISTRICT ATTORNEY'S OFFICE AND ALL COURT COSTS. APPELLANT SHALL RECEIVE CREDIT FOR 276 DAYS SERVED WHILE AWAITING TRIAL.**

**WALLER, C.J., DICKINSON, P.J., KITCHENS, KING, COLEMAN, MAXWELL, BEAM AND CHAMBERLIN, JJ., CONCUR.**