# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-00960-COA

**RONALD GOODLOE A/K/A RONALD LARRY GOODLOE A/K/A RONALD L. GOODLOE**                    APPELLANT

v.

**STATE OF MISSISSIPPI**                    APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 08/02/2021 |
| TRIAL JUDGE: | HON. MICHAEL PAUL MILLS JR. |
| COURT FROM WHICH APPEALED: | ALCORN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: JUSTIN TAYLOR COOK |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ALEXANDRA LEBRON |
| DISTRICT ATTORNEY: | JASON D. HERRING |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 08/05/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE BARNES, C.J., McCARTY AND LASSITTER ST. PÉ, JJ.**

**BARNES, C.J., FOR THE COURT:**

¶1.     Ronald Goodloe was found guilty as charged for two counts of sexual battery and one count of fondling after a jury trial in the Alcorn County Circuit Court.[1]  The victims, Jane and Amy, were the daughters of Goodloe's girlfriend, Alex.[2]  During the abuse, the girls were ages five to six and six to seven, respectively.  Goodloe's indictment was amended to

---

[1]  Goodloe was charged with one count of sexual battery and one count of fondling of Jane and with one count of sexual battery of Amy.  This proceeding was Goodloe's third trial.  His first and second trials ended in mistrial because the juries could not reach verdicts.

[2]  The names of the victims have been changed to protect their identities because they are minors.  We shall use the same pseudonyms the parties used.

allege he was a violent habitual offender, and after conviction, he received three mandatory sentences of life imprisonment without eligibility for parole or probation for each conviction.[3]

¶2.    Goodloe appeals, raising two issues. He argues that the trial court erred in allowing an expert child therapist to testify about the truthfulness of Jane's and Amy's accusations against Goodloe, and he insists that his trial counsel was constitutionally ineffective. Finding no reversible error, we affirm.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶3.    In May 2014, Alex was living in Corinth, Mississippi, with her two daughters, Jane and Amy, who were in kindergarten and first grade, respectively. A neighbor introduced Alex to Goodloe, who also lived in Corinth. Alex and Goodloe learned they both shared beliefs as Jehovah's Witnesses. Immediately, the couple began dating, with Goodloe's staying at Alex's house almost daily. Alex testified they would do activities together often and go to Jehovah's Witnesses meetings as a family. The children called the defendant "Daddy Ron," and soon Alex trusted him to be alone with her daughters.

¶4.    Several months into the relationship, Alex noticed that her children were exhibiting sudden behavioral changes. Teachers also noticed that Amy, who was normally quiet and

---

[3] In 2006, Goodloe pleaded guilty to two counts of first-degree sexual abuse in Alabama. He was sentenced to serve two years in prison. In those cases, Goodloe penetrated the rectum of a nine-year-old boy with a pool cue stick and had forcible sexual conduct with another young boy. In both crimes, Goodloe came into contact with the children through the Jehovah's Witnesses congregation. Additionally, in 2009, Goodloe pleaded guilty to failure to register as a sex offender in Alcorn County, Mississippi, for which he served one year in prison.

2

reserved, began "acting out" and having angry outbursts. This behavior was affecting her schoolwork. Amy was also clawing and hitting herself; so she began counseling at school with Marissa Nooner, a child therapist and social worker. Jane, who was more outgoing, began making inappropriate comments. She also began using the bathroom on herself, even though she had been potty-trained for years.

¶5. In April 2015, an incident caused Alex to realize Goodloe was sexually abusing her daughters. They were visiting a neighbor and her children at the neighbor's house. Amy alerted Alex and the neighbor that Jane was in a bedroom with the neighbor's daughter "doing something nasty." The mothers went to the bedroom to find the two girls on the bed. When Alex asked Jane what she had been doing, Jane responded that she was rubbing her "special" (which is what Jane called genitals) on the other girl's "special." Alex testified that she was "floored" at this discovery and asked Jane from whom she learned that behavior. Jane responded "from Daddy Ron."

¶6. Alex then took her daughters home, where she questioned them separately. Jane recounted to her mother that one day when Alex went to the store to get her daughters candy, Goodloe played hide-and-seek with them. He told Amy to count and took Jane to the bathroom to "hide." Goodloe shut the door, turned off the lights, and put Jane on her stomach. Jane told her mother that Goodloe put his "special" in her "special." Alex then talked to Amy alone. When Alex asked Amy if Goodloe had ever touched her, Amy just began crying and hugged her mother. Alex later discovered inappropriate drawings on the back of Jane's homework, which depicted Jane and Goodloe in bed together with

3

inappropriate captions.

¶7.     Soon after her daughters' disclosures, Alex went to the Corinth Police Department on April 15, 2015, to file a report. Detective Heather Russell, the lead investigator, referred the case to Aleasa Helsinger of Child Protection Services (CPS). Helsinger interviewed both girls and found their allegations of sexual abuse by Goodloe substantiated. She recommended Jane begin seeing Nooner as well for therapy.

¶8.     On April 21, 2015, Marie Frison, a child therapist, conducted separate forensic interviews with the girls. The interviews were recorded, entered into evidence, and played for the jury. At trial, Frison was accepted as an expert in forensic interviewing of sexually abused children. Jane's and Amy's interviews lasted approximately fifty and thirty minutes, respectively. During the interviews, the children made drawings recounting the abuse. These drawings were admitted into evidence.

¶9.     Both children disclosed Goodloe had sexually abused them while he lived with them. They provided extensive and consistent details about the abuse. Jane disclosed that she had been abused numerous times in various rooms. Jane told Frison that Goodloe put his penis inside her vagina, touched her vaginal area and buttocks, and made her touch his penis. Jane denied any oral sex or viewing of pornography. When Frison asked Jane if she had seen Goodloe's penis, Jane said yes and drew it. Jane also recounted the sexual-abuse incident in the bathroom with Goodloe, as well as sexual abuse by Goodloe's son, a minor.

¶10.   During Frison's interview with Amy, she told Frison that Goodloe had touched her vaginal area, put his penis in her vagina, and touched the inside of her vagina with his hand.

4

Amy told Frison that it felt "nasty." She described in detail the way their bodies were in bed, and she said that this conduct happened more than one time. Frison concluded that both of the girls' disclosures "were consistent with children who had been sexually abused." In reaching her opinion, Frison looked at the interviews' content, consistency, context, and details. Frison testified that nothing indicated the girls had been "coached" on what to say.

¶11. Marissa Nooner, a children's therapist and licensed master social worker, was accepted at trial as an expert in trauma therapy for sexually abused children. By August 2015, both children were seeing Nooner at her office, one-on-one, and did so for a little over a year. Both children screened positive for sexual abuse during their first sessions with Nooner and identified Goodloe as the abuser. Additionally, both Amy and Jane were found to suffer from post-traumatic stress disorder due to the sexual abuse. Neither child disclosed that any adult other than Goodloe had sexually assaulted them.

¶12. In February 2016, during separate therapy sessions, both children created drawings and a "trauma narrative" about the sexual abuse committed by Goodloe, which later would be admitted into evidence. One of Amy's drawings was of a bedroom with two people, her and Goodloe, lying in the bed. Nooner explained that Amy wrote on the drawing, "He rubbed his penis on me. I was on the bed in Mommy's room. Mommy was at the store getting me candy. I was getting a surprise because I cleaned." Amy told Nooner the "he" she referred to was Goodloe. Amy's trauma narrative stated that the abuse happened two times. Further, Amy did not know Goodloe was sexually abusing Jane as well.

¶13. Jane drew a bathroom with two figures in it, her and Goodloe. Nooner testified that

Jane wrote on the drawing, "The floor was hard. My pants were off. I laid [sic] on my stomach. Ron stuck his penis in my hiney." In the drawing, Jane explained to Nooner that Goodloe was drawn with a shirt but no pants on. Jane stated she did not know where his pants were. Jane drew herself with her pants off; they were drawn by the door. Jane also told Nooner that Goodloe's penis was "hard." She drew Goodloe on his knees, with an erect penis, behind Jane, who was lying on her stomach, Jane told Nooner that she placed her hands over her eyes during the sexual assault and kept thinking "the floor is hard, the floor is hard." Jane's trauma narrative stated, "We started in the bathroom. He touched me, but I didn't do [any]thing to him. He touched me inside my booty with his penis. He did it a lot of times in my bedroom, the living room, and mostly in mom's bedroom. They were at the store." Jane stated the "he" was Goodloe. Additionally, Nooner testified that Jane wanted to wear boy clothes to school, believing the abuse would not have happened if she were a boy. Jane also refused to bathe, telling Nooner that if she was "stinky" and dirty, Goodloe would not "mess with her."

¶14.   At trial, toward the end of Nooner's direct examination, the prosecutor asked, in Nooner's professional opinion, what the likelihood was that either child was "pretending or inventing" the abuse. The defense objected, arguing that Nooner was not competent as an expert to determine whether the children were telling the truth. The trial court ruled that Nooner was "qualified to answer from the perspective of does she believe, based upon her experience, that the answers [were] truthful, that the experiences that were relayed to her [were] truthful. I don't know if she can answer the likelihood of it being truthful." The

6

prosecutor rephrased the question, asking Nooner if she had an opinion as to whether the children were being truthful. Nooner responded that she believed they were being truthful because of the multiple behavioral issues the children exhibited over the last year prior to the sexual-assault disclosure. Nooner also pointed to the fact that both girls offered numerous details, including Jane's drawing of an erect penis, which Nooner testified was not typical knowledge for a child of her age. Further, their stories were consistent. Nooner concluded that it was her expert opinion both children's statements and behaviors were consistent with those of sexually abused children.

¶15. Jane and Amy testified at trial, again consistently recounting their previous disclosures about the sexual abuse. At trial, they were ages twelve and thirteen, respectively. Both children testified that Goodloe had told them "not to tell" about the sexual abuse, or he would hurt their mother. Additionally, Alex's neighbor and an elementary school teacher testified about changes in the girls' behaviors.

¶16. Goodloe testified in his own defense. At the time, he was married with a total of four children—a child from a previous marriage, a five-year-old girl by Alex, and two small children from his current marriage. Goodloe testified that he wanted to be like a father-figure to Amy and Jane. His defense was that Alex was jealous of his current wife, Erica, because when Goodloe was still dating Alex, he had cheated on her with Erica. Ultimately, he broke up with Alex to be with Erica around the time Alex gave birth to his child, a daughter. Goodloe claimed Alex sought revenge by encouraging Jane and Amy to make the sexual abuse allegations, which he denied.

7

¶17. Goodloe's wife, Erica, testified in his defense as well. Erica testified that they had been married for five years and confirmed that they began their relationship while Goodloe was in a relationship with Alex. Erica trusted Goodloe with her children and did not believe the prior sexual assault charges were valid. Erica agreed with Goodloe that the current criminal charges were fabricated as a result of Alex's retaliating against Goodloe for "cheating" on her.

¶18. Ultimately, the jury found Goodloe guilty of all three counts, and the court sentenced him to three terms of life imprisonment without eligibility for parole. He now appeals.

## ANALYSIS

### I. Nooner's Expert Testimony

¶19. Goodloe claims the trial court erred in allowing Nooner to testify, in her opinion, that Jane's and Amy's accusations against him were truthful. He argues that allowing this testimony deprived him of a fair trial.

¶20. This Court reviews a "trial court's admission or suppression of evidence, including expert testimony," for an abuse of discretion. *Lawson v. State*, 292 So. 3d 266, 276 (¶29) (Miss. Ct. App. 2019) (quoting *Russell v. Russell*, 148 So. 3d 1052, 1055 (¶13) (Miss. Ct. App. 2014)). "Reversal will be appropriate only when an abuse of discretion resulting in prejudice to the accused occurs." *Id.* (quoting *Dandass v. State*, 233 So. 3d 856, 865 (¶25) (Miss. Ct. App. 2017)).

¶21. In child sex-abuse cases, an expert witness called to testify may not give a direct opinion on the victim's truthfulness. *Elkins v. State*, 918 So. 2d 828, 831-32 (¶9) (Miss. Ct.

App. 2005) (citing *Jones v. State*, 606 So. 2d 1051, 1057-58 (Miss. 1992); *Griffith v. State*, 584 So. 2d 383 (Miss. 1991)). The Mississippi Supreme Court has held that in child sex-abuse cases, evidence that the forensic interviews with the minor victims were "credible, i.e. capable of being believed," is properly admitted; however, "comments about a witness' veracity, i.e. truthfulness, will generally be inadmissible, because of its 'dubious competency.'" *Smith v. State*, 925 So. 2d 825, 838-39 (¶32) (Miss. 2006) (citing *Williams v. State*, 539 So. 2d 1049, 1051 (Miss. 1989)). Courts in other jurisdictions have found "such testimony usurps the traditional role and function of the jury by giving the jury the expert's opinion on how the case should be decided." *Id.* at 836 (¶27) (citations omitted).

¶22. In *Elkins v. State*, 918 So. 2d 828, 831 (¶7) (Miss. Ct. App. 2005), the defendant claimed that a social worker who conducted a forensic interview concerning a child's allegations of sexual abuse improperly testified about whether the victim was telling the truth about the abuse. *Id.* at 831 (¶7). This Court found the testimony proper, holding that while a witness's testimony about the truthfulness of the child's allegations was inadmissible, in that case the social worker did not testify about the victim's truthfulness but, rather, that the victim's "behavior and demeanor were consistent with those of children who had been sexually abused." *Id.* at 832 (¶9). This type of testimony would be within the scope of permissible expert testimony under Rule 702. *Id.* (citing *United States v. Whitted*, 11 F.3d 782, 785-86 (8th Cir. 1993)).

¶23. Here, Nooner gave two opinions in her testimony. As in *Elkins*, Nooner properly testified about the victims' statements and demeanors during their interviews being

9

consistent with those of sexually abused children. However, Nooner also briefly testified about the truthfulness of the children during their forensic interviews about the sexual abuse. This improper testimony, though, was harmless. The majority of Nooner's testimony was her opinion that the victims' behavior during the interviews was consistent with sexually abused children. "In deciding whether the admission of testimony is harmless error, the appellate court 'must determine whether the weight of the evidence against the defendant is sufficient to outweigh the harm done by allowing admission of the evidence.'" *Roberson v. State*, 287 So. 3d 219, 239-40 (¶64) (Miss. Ct. App. 2017) (quoting *Veasley v. State*, 735 So. 2d 432, 437 (¶17) (Miss. 1999)). Further, the supreme court has stated that, while inadmissible, that court "has never explicitly held that a direct comment on a child sex abuse victim's veracity is reversible error. . . ." *Smith*, 925 So. 2d at 835-36 (¶27) (citing *Griffith*, 584 So. 2d at 386-87).

¶24.   Moreover, Goodloe has shown he suffered no harm from the admission of Nooner's testimony due to the great weight of the evidence against him. Helsinger, who conducted the investigation for CPS, testified that the victims' claims of sexual abuse were substantiated. Alex, her neighbor, and Jane's teacher all testified about how they noted the girls' sudden changes in behavior, which Nooner testified was consistent with sexually abused children. Nooner testified that both victims disclosed numerous details about the abuse, and their stories remained consistent. The girls never wavered from their accusation that Goodloe was the perpetrator. Further, Frison also opined that their disclosures were consistent with those of children who had been sexually abused. As the supreme court

explained in *Smith*, the jury could examine the videotapes of the forensic interviews, which were played for the jury, and compare them with the victims' in-person testimony and demeanor at trial. In this way, the jury could draw from "their own life experiences" to form their own conclusions about the girls' truthfulness. *Smith*, 925 So. 2d at 839 (¶33). "As always, the jury has the prerogative to accept or reject, in whole or part, the testimony of any witness, expert or lay." *Id.*

¶25. Even though Nooner was allowed to testify improperly as to the girls' truthfulness during the forensic interview, the error was harmless and does not require reversal. The weight of the evidence of Goodloe's guilt was sufficient to outweigh any harm caused by the admission of the opinion testimony.

## II.    Ineffective Assistance of Counsel

¶26. Goodloe argues that his trial counsel was constitutionally ineffective because he failed to offer an opening statement and failed to submit any jury instructions. Goodloe claims both failures prejudiced his defense. Additionally, Goodloe contends that trial counsel failed to object to the testimony of Detective Russell, who offered improper opinion evidence about the children's forensic interviews and was allowed to testify beyond the scope of her personal knowledge.

¶27. First, we must determine if Goodloe's ineffective-assistance-of-counsel claims are best raised here or in post-conviction relief proceedings. The general rule is that "ineffective assistance of counsel claims are more appropriately brought during post-conviction proceedings." *Gregg v. State*, 372 So. 3d 132, 137 (¶13) (Miss. Ct. App. 2023) (quoting

11

*Ross v. State*, 288 So. 3d 317, 324 (¶29) (Miss. 2020)). However, this Court may address such claims on direct appeal when (1) "the record affirmatively shows ineffectiveness of constitutional dimensions," or (2) "the parties stipulate that the record is adequate and the Court determines that the findings of fact by a trial judge able to consider the demeanor of witnesses . . . are not needed." *Id.* Additionally, our appellate courts have resolved ineffective-assistance claims on direct appeal "when the record affirmatively shows that the claims are without merit." *Id.* The State does not stipulate that the record is adequate for this Court to make findings on the merit.

¶28. We shall address Goodloe's argument on failure to make an opening statement because the record affirmatively shows the claim is without merit. We deny relief of Goodloe's remaining two arguments on jury instructions and Detective Russell's testimony, without prejudice. These two arguments are based on facts not fully apparent from the record, including facts related to counsel's trial strategy and tactics. Goodloe may request permission from the Mississippi Supreme Court to pursue these ineffective-assistance-of-counsel arguments in a motion for post-conviction collateral relief.

¶29. To succeed on his ineffective-assistance-of-counsel claim, Goodloe must show: "(1) his counsel's performance was deficient, and (2) this deficiency prejudiced his defense." *Ross*, 288 So. 3d at 324 (¶31) (quoting *Ashford v. State*, 233 So. 3d 765, 779 (¶50) (Miss. 2017)). There is a strong presumption that "counsel's conduct falls within the wide range of reasonable professional assistance, and the challenged act or omission might be considered sound trial strategy." *Id.* (quoting *Swinney v. State*, 241 So. 3d 599, 613 (¶60)

(Miss. 2018)). Even if in error, counsel's performance will only be found deficient "if there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Id.*

¶30. Here, after the State's opening argument, the trial court allowed defense counsel to reserve his opening statement until the beginning of his case-in-chief. At that time, the trial court reminded the defense that it could present an opening statement or waive it again and move forward with witness testimony. Defense counsel chose to waive it and called Goodloe to the stand. Goodloe now claims his trial counsel's waiver was deficient. Goodloe contends the waiver prejudiced his defense because he could not assert a theory of defense or challenge the State's case.

¶31. Opening statements are not mandatory. According to our rule and statute, opening statements are permissive. *Compare* MRCrP 19.1(a)(2)-(3) *with* Miss. Code Ann. § 11-7-147 (Rev. 2019). Further, the supreme court has held that the "[f]ailure to give an opening statement is not per se ineffective assistance of counsel." *Branch v. State*, 882 So. 2d 36, 55 (¶42) (Miss. 2004) (citing *Rushing v. State*, 711 So. 2d 450, 458 (Miss. 1998)). Rather, "an attorney's failure to provide an opening statement is a matter of trial strategy." *Spicer v. State*, 973 So. 2d 184, 197 (¶39) (Miss. 2007) (citing *Rushing*, 711 So. 2d at 458) ("Opening statements are not mandatory.").

¶32. Goodloe's waiver of an opening statement was not deficient and did not result in prejudice to him. The waiver could be considered trial strategy. Moreover, Goodloe's counsel gave a thorough and clear closing argument, advocating for his client, where he

13

summarized the defense's theory of the case and challenged the State's case. This claim is without merit.

## CONCLUSION

¶33. Allowing Nooner to testify about the girls' truthfulness during the forensic interviews was harmless error. The evidence of Goodloe's guilt sufficiently outweighed any harm caused by the trial court's admission of the testimony. Further, Goodloe did not receive ineffective assistance of counsel for his trial counsel's failure to give an opening statement. Accordingly, we affirm Goodloe's convictions and sentences.

¶34. **AFFIRMED.**

**CARLTON AND WILSON, P.JJ., LAWRENCE, McCARTY, EMFINGER AND LASSITTER ST. PÉ, JJ., CONCUR. WESTBROOKS AND McDONALD, JJ., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WEDDLE, J., NOT PARTICIPATING.**