MYERS, P.J.,
for the Court.
¶ 1. Whitzey Santaiz Walker appeals his conviction in the Warren County Circuit Court of burglary of a dwelling and sentence as a habitual offender of twenty-five years in the Mississippi Department of Corrections. Walker argues that the evidence presented at trial was insufficient to support the jury’s guilty verdict, particularly that the evidence could not support a finding that he entered the dwelling with the intent to commit assault inside. Finding no error, we affirm.
FACTS
¶ 2. Melissa Lyons testified that on the night of July 16, 2006, she and her husband were asleep in the bedroom of their home when she was awakened by the barking of her dog, which also slept in the master bedroom. Melissa then heard “banging” on the front porch area of her home, but she could not identify whether it came from the door, the window, or the porch. On direct examination by the State, she elaborated as follows:
Q. Tell me what happened that night.
A. It was about 11:00. I was almost asleep and the dog started growling and making this noise. I heard all this bumping going on the front porch. My bedroom, my master bedroom is behind my living room. So I came across — my children live next door — in a trailer next door. And I thought something was wrong. I have two labs. I thought they may have run an armadillo up in [sic] my porch before running against the door. I didn’t know what it was. I just jumped up. And then the dog was acting up. Went to the door. And like an idiot, I opened it completely opened, just like that (Indicating).
Q. What did you see?
A. And I saw that fellow over there (Indicating).
BY MR. BONNER: Your Honor, we would like for the record to reflect that she’s identified the defendant, Mr. Walker.
BY THE COURT: The record will so reflect.
*665 (THE WITNESS IDENTIFIED THE DEFENDANT.)
A. He was standing at my front porch. Here’s my door when you open the door. I have two windows here. My porch goes out this way. And I had two big chairs right here (Indicating). Well, he was pulling this chair back. He was messing with this window, my further window (Indicating). He was about ten feet from me. He, you know, raised up and looked at me. He said something about my house. Coming in my house or something about my house. I thought he said: “I’m coming in your house.” And I said: “Oh, hell, no.” And I slammed that door. He ran toward me. I’m fairly good size. I pushed — and I was scared to death. I pushed the door shut, locked it and started screaming for my husband, who I thought was asleep. I took two steps from that door, I took maybe two, maybe three steps. I had this little table here at the time. I had a little table that I did my little craft work on close to the window. He came through that window, just I don’t know how he did it. He came down, and he stood up. And he was coming across to me, and he must have been three feet from me—
Q. Let me stop you. Was the window opened?
A. No. No. The window was not opened. The window was not opened. Let me get, kind of—
Q. Get your bearings.
A. Yeah. When I was walking, I was yelling for my husband, and I was trying to run. And he came through that window. We got new windows. Okay. You pull them out. You can clean them, and you can push them back in. Don’t buy those kind. He hit that window, and came though it, and he stood up. And he was coming across the room toward me. He had his hands up. And all I know is if my husband would not have been there, I would be gone. Really — It was the scariest thing I’ve ever seen.
[[Image here]]
Q. Tell me what happened.
A. I screamed. I think I said: “Sherwood, you better get in here.” You know, I was screaming it over and over.
Q. Who’s Sherwood?
A. Sherwood is my husband. I said: “Get in here. Get in here,” you know. Before I got too far, he was right on me. And I said: “Get out of my house. Get out of my house.” I had my hands up.
Q. You’re talking about two different he’s. You need to clarify for the record.
A. Sherwood was in the bedroom. I was yelling for him to come out. I couldn’t see him, because I was watching this one coming though, Mr. Walker (Indicating). You know, I had my eyes there, and I was like: “Get out of my house. Get out of my house.” And he was coming steady for me.
Q. Tell me what happened.
A. The next thing I see, Sherwood hits him with his hand, knocks him down, grabs a chair, and I’m like running around in circles. I’m like, looking for a phone, looking for a gun. I didn’t know what to do. I didn’t even cut the lights on. I was so upset. You know, Sherwood had him. They were wrestling. He had him with the chair. It was just awful. I ran to the phone. I grabbed a phone. Oh, they knocked over all the lighting, the tables. It was terrible. I got a phone and called 911. That was a big confusion, because they couldn’t find my house. It was just confusion. And they wrestled around on the floor awhile. I made it to the bedroom, got a gun, got a phone, ran outside to stop the officers. And finally, I think I talked to *666 911 twice maybe three times. We had to call each other back, because I had to stop what I was doing and find — get—• you know, find a gun, and you know, trying to help. I wasn’t very much help.
On cross-examination, Melissa also elaborated that:
Q. From the time he knocked on the door and you first saw him, until the time you slammed the door on him, how long are we talking about?
A. Seconds.
Q. Seconds. Seconds. When you slammed the door, was he still trying to say something to you?
A. Un-hnh (Indicating no). He was rushing me.
Q. Was he rushing you—
A. Rushing me. No, rushing. Bang. I slammed the door and held it against him and locked my door. I had to push my door shut.
Q. I understand.
A. I don’t think you do.
Q. Well, I mean, you pushed your door shut. It’s not—
A. No. The door is easy to open and shut. I had to push it against body weight. He was coming in my house.
Melissa also testified that, although she avoided injury, the front door jam was cracked during the confrontation.
¶ 3. On direct examination, Sherwood Lyons, Melissa’s husband, testified that:
Well, we had watched the late news, and we went to sleep. I was working shift work, and the little dog started barking and raising cane, right before midnight, 11:00 or something. And I was sound asleep, and I asked Melissa to go check and see what that pounding was. You know, somebody might have been — I thought the kids were coming in and out or something. And she went to the front door, and I heard her screaming, you know: “Hell, no.” And she started screaming: “Get here.” And when I jumped up out of the bed, and got to the door of my bedroom which was right outside the living room. The door from the living room goes into the bedroom. And I looked across there, and this guy had dove through our window and was climbing up like that going toward Melissa (indicating). And the room is about 24 foot long. It’s a pretty big room. He was probably about eight foot from the other wall, so — He was coming at Melissa. And Melissa’s legs go to rubbing when she gets real frightened, and she was telling him, to get back, get back. And he was rushing at her, and I ran over there, and knocked him down on the ground. I couldn’t even tell who he was or what. And, you know, put my foot on him and restrained him. Told Melissa to call 9 — screamed at her and told her to call 911. And she went in there, and I heard her call them and stuff. And it seemed like forever before the police got there, but you know, it probably wasn’t, but it seemed like it. And they finally came and cut the lights on, and you know, I couldn’t believe this guy was an older guy. I thought it was a kid, because there was [sic] kids been going up [and] down the road. And it was an older guy, and he broke in on us. You know, I’m glad the police came on and got there and stuff, and it was blood everywhere, where he dove through my widow. And I was worried about that.
John Elfer, a patrol officer with the Warren County Sheriffs Department, testified he responded to a possible burglary in progress. When he arrived at the Lyons-es’ home, he placed a man, later identified as Walker in custody. Officer Elfer elaborated:
Q. Did he give you any trouble?
*667 A. He refused to comply with' our commands. He was told to turn over, place his hands behind his back. The normal operations that we go through to try to place someone in handcuffs. He was kicking. I don’t remember him saying anything. But we had to use force, myself and the other officer, to get the handcuffs on him, get him on his stomach. And then he wouldn’t stand up for us, we had to physically take him outside.
¶ 4. At the close of the State’s case-in-chief, Walker moved for a directed verdict, arguing that the State had failed to prove intent to commit assault within the Lyons-es’ home contemporaneous with Walker’s breaking and entering the dwelling. The trial court denied the motion, observing:
The jury determines whether or not there was intent to commit an assault. And if they do find that, that’s a jury question, then they can return a verdict of guilty on the issue of burglary because then you would have the two prongs of burglary completed. But that’s a jury question. It’s not for the Court to determine that. And that can only be determined through the facts of the case.
As I said before, it did not have to be an aggravated assault. It could have been a simple assault. And as you know, simple assault carries when someone makes a threatening gesture toward someone, and that person feels that they are in imminent danger to that person.
The Court must take as true all the statements given by Ms. Lyons. Now, the jury does not have to take that as true in their decision at the end of the case. But at this point in time, the Court must take as true all of the statements as to Ms. Lyons, as to what she felt, that she felt threatened, and what happened on that night.
Therefore, the Court finds that the Motion for Directed Verdict should fail because there are jury questions as to whether or not this was assault or intent to assault — not actual assault but the intent to assault. That’s a jury question.
¶ 5. In his defense, Walker testified that his mother had died shortly before the incident and that he and his wife “had a real bad argument.” Walker then left his home for four or five days, which he spent drinking and using cocaine. He testified that on the night of July 16, 2006, he was “just driving, crying and drunk” when his automobile was struck from behind and forced off the road by another vehicle. After extricating himself from his wrecked car, Walker walked to a brick home where he knocked on the door. He testified as follows:
So I knock on the door, boom, boom, boom, boom, boom, boom. So I ain’t expect — I didn’t know who would come to the door. So the lady, Ms. Lyons, she came to the door. I said: “Ma’am,” I said, “I had a car wreck.” I say [sic] “Somebody ran me off the road. I had a real bad car accident.” I said: ‘Would you call an ambulance and a tow service for me?” She said, “no.” She closed the door. I’m drunk. I’m high. I hadn’t been home. I haven’t had no [sic] sleep, zero sleep, at all for four days of straight drinking, no rest, no sleep, no nothing. So and I turned around. I turn around. I say, bam, my back was against a window. I don’t remember being in no [sic] house, and my legs was [sic] like this here outside, I mean, right there in the windowsill (Indicating). It was a brick windowsill, and right there in the windowsill, just like this here, like this here, laid out (Indicating). I passed completely out. I woke up two or three days later in the hospital, not knowing *668 where I am [sic]. I didn’t know nothing. I don’t remember nothing [sic]. But waking up two to three days later.
Walker also produced his wife, Veronica Walker, who attested that her husband’s automobile had been wrecked. Veronica also stated that, following the incident, Walker had spent three to four days in the hospital.
¶ 6. The jury subsequently convicted Walker of burglary of a dwelling. After concluding a sentence-enhancement hearing, the trial court adjudicated Walker to be a habitual offender and sentenced him to serve twenty-five years in the MDOC, without eligibility for probation or parole. The trial court subsequently denied Walker’s motion for a judgment notwithstanding the verdict, and Walker timely appeals.
WHETHER THE EVIDENCE OF BURGLARY WAS SUFFICIENT.
¶ 7. The supreme court has stated that “the critical inquiry is whether the evidence shows ‘beyond a reasonable doubt that accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction.’ ” Bush v. State, 895 So.2d 836, 843(¶ 16) (Miss.2005) (quoting Carr v. State, 208 So.2d 886, 889 (Miss.1968)). The supreme court cautioned, however, that:
this inquiry does not require a court to “ ‘ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.’ Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.”
Id. (quoting Jackson v. Virginia, 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). The supreme court continued:
Should the facts and inferences considered in a challenge to the sufficiency of the evidence “point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty,” the proper remedy is for the appellate court to reverse and render. However, if a review of the evidence reveals that it is of such quality and weight that, “having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense,” the evidence will be deemed to have been sufficient.
Id. (internal citations omitted).
¶ 8. Walker was charged with burglary of a dwelling, with the intent to assault the occupants of the home, pursuant to Mississippi Code Annotated section 97-17-23 (Supp.2008). Section 97-17-23(1) defines burglary of a dwelling as “breaking and entering the dwelling house ... of another ... with intent to commit some crime therein.” Likewise, assault is defined by Mississippi Code Annotated section 97-3-7(1) (Supp.2008), which provides in pertinent part that “[a] person is guilty of simple assault if he (a) attempts to cause or purposely, knowingly or recklessly causes bodily injury to another; or ... (c) attempts by physical menace to put another in fear of imminent serious bodily harm.... ”
¶ 9. Burglary thus requires both an unlawful breaking and entering, as well as a contemporaneous intent to commit a crime therein, and the State is required to prove each element to sustain a conviction. Newbum v. State, 205 So.2d 260, 263 *669 (Miss.1967). On appeal, Walker argues that the State failed to sufficiently prove he had the requisite intent to commit an assault at the time he entered the Lyonses’ home.
¶ 10. The supreme court has stated that “all the proof need not be direct and the jury may draw any reasonable inferences from all the evidence in the case.” Campbell v. State, 278 So.2d 420, 423 (Miss.1973). Thus, intent may be proven by circumstantial evidence. Stinson v. State, 375 So.2d 235, 236 (Miss.1979). Indeed, as the supreme court has stated: “If intent required definite and substantive proof, it would be almost impossible to convict, absent facts disclosing a culmination of the intent. The mind of an alleged offender, however, may be read from his acts, conduct, and inferences fairly deducible from all the circumstances.” Newbum, 205 So.2d at 265 (quoting 13 Am.Jur.2d Burglary § 52 (1964)).
¶ 11. The testimony most favorable to the prosecution was that following the confrontation on the Lyonses’ porch, Walker attempted to force his way through the front door. When Melissa succeeded in pushing the door closed and locking it, Walker crashed through a glass window and advanced briskly upon Melissa with his hands raised, in what was described as a threatening gesture. Viewing the evidence in a light most favorable to the prosecution, as we must, the evidence was sufficient for a reasonable jury to infer from these facts that Walker intended to assault Melissa inside her home at the time of the breaking and entering. This argument is without merit.
¶ 12. THE JUDGMENT OF THE CIRCUIT COURT OF WARREN COUNTY OF CONVICTION OF BURGLARY OF A DWELLING AND SENTENCE AS A HABITUAL OFFENDER OF TWENTY-FIVE YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITHOUT ELIGIBILITY FOR PAROLE OR PROBATION IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO WARREN COUNTY.
KING, C.J., LEE, P.J., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS CARLTON AND MAXWELL, JJ„ CONCUR.