# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-KA-01121-COA

ROY McNAIR, SR. A/K/A ROY McNAIR            APPELLANT

v.

STATE OF MISSISSIPPI            APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 09/01/2021 |
| TRIAL JUDGE: | HON. JON MARK WEATHERS |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: CASEY BONNER FARMER |
| DISTRICT ATTORNEY: | PATRICIA A. THOMAS BURCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 08/30/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE BARNES, C.J., GREENLEE AND LAWRENCE, JJ.

### GREENLEE, J., FOR THE COURT:

¶1. Roy McNair Sr. (Roy) was convicted of committing aggravated domestic violence against his wife, Rosie McNair (Rosie), in the Forrest County Circuit Court. The circuit court sentenced Roy to a term of twenty years in the custody of the Mississippi Department of Corrections and ordered him to pay all court costs. On appeal, Roy challenges the sufficiency and weight of the evidence. Finding no reversible error, we affirm Roy's conviction and sentence.

## FACTS AND PROCEDURAL HISTORY

¶2. In September 2017, Roy and Rosie were married, but Rosie had initiated divorce

proceedings approximately ten months earlier because Roy had displayed "aggressive behavior" and engaged in activities that were "not conducive to marri[ed] life." Rosie remained in the marital residence, which was located in Palmer's Crossing in Hattiesburg, Mississippi, and Roy moved into an apartment in Petal, Mississippi. The divorce proceedings were ongoing because assets—including the marital residence—were in dispute, and Roy was seeking financial assistance from Rosie.

¶3. On September 24, 2017, Rosie locked the door behind her as she entered the marital residence. She had an evening routine, which involved checking her emails in a bedroom that had been converted into a home office. According to Rosie, Roy was familiar with her routine. That evening, she turned on the light and closed the blinds, and then two gunshots were fired through the window, severely injuring her.[1] According to surveillance footage obtained from the residence and the timing of the 911 call, the shooting occurred at 7:57 p.m.[2]

¶4. At 8:04 p.m., Officer Harry Crockett with the Hattiesburg Police Department responded to the scene. When he arrived, officers broke the window to gain entry and assist Rosie. According to Officer Crockett, there was no evidence that anyone other than Rosie had been inside the residence that night. Similarly, Investigator Jeff Byrd with the Hattiesburg Police Department testified that there were no signs of forced entry.

¶5. Although Rosie did not see the shooter, she identified Roy as a possible suspect.

---

[1] Rosie was a patient at the VA Medical Center for approximately three and a half years after the shooting.

[2] The shooter was not captured by surveillance footage at the residence.

2

Rosie suggested that Roy's motive for shooting her was financial. According to Rosie, Roy would inherit the marital residence in the event of her death. Additionally, a military "Death Gratuity Benefit" in the amount of $100,000 would automatically be paid to her spouse—Roy—upon her death.[3]

¶6.     Meanwhile, Shirley Ford, who previously had had an on-and-off relationship with Roy, received a phone call from him that night. This call surprised Ford because she had not spoken to Roy since their relationship ended approximately two months earlier. According to Ford, Roy called her again and said, "Something was going on at my house . . . . I don't know . . . something about Ros[i]e got shot." According to Ford, Roy said that he heard that someone else had said, "Well, I guess Roy finally shot Rosie." When Ford told Roy that she thought she had seen his vehicle at the railroad track in Palmer's Crossing between 8:00 p.m. and 8:30 p.m. that evening, he asked, "What track? The track down by the old Hudson building?" Ford wondered how Roy knew the exact location because she had not specified. Then Roy stated that he had not left his apartment in approximately two months.

¶7.     Despite Roy's claim that he had not left his apartment, Detective Jon Howell with the Hattiesburg Police Department obtained surveillance footage that indicated otherwise. According to Detective Howell, surveillance footage from the Petal Senior Center, which was located near Roy's apartment, showed a vehicle matching the description of Roy's vehicle—a maroon/burgundy 2000 GMC Sierra with modifications—driving away from his

_____

[3] Rosie indicated that she also had a life insurance policy in the amount of $400,000 and that her biological sons and grandson were the designated beneficiaries. However, Rosie did not believe that they were aware of their status as beneficiaries.

3

apartment at 7:22 p.m. that night. The footage also showed the vehicle driving toward his apartment at 8:24 p.m.

¶8. Roy's biological son, Devin McNair (Devin), testified that Roy came by his residence to get a plate of food around 8:00 p.m. that evening but only stayed for a few minutes and was acting "a little weirdish." According to Devin, Roy gave him a brown Ithaca shotgun and instructed him to "[g]et rid of it." Devin testified that Roy also gave him a pillowcase containing shotgun shells. Devin did not want to take the shotgun from his father because Devin previously had been convicted of a felony, but he took the gun anyway. Then he gave the shotgun to Chris Roberts, whom he considered "a trusted friend." Afterward, Devin learned that Rosie had been shot. When he called Roy, there was no answer; so he and his fiancée, Kristen Nicole Dawkins, went to Roy's apartment around 10:30 or 11:00 p.m. Devin testified that he questioned Roy about Rosie being shot, and Roy responded, "I did what I had to do."

¶9. Shortly after midnight—after Rosie had identified Roy as a possible suspect—Sergeant Neal Rockhold with the Hattiesburg Police Department called Roy and spoke with him over the telephone. Roy agreed to go to the police station but never did. As a result, Sergeant Rockhold went to Roy's apartment and arrested him.

¶10. Around 3:00 a.m., Roy agreed to an interview. According to Sergeant Rockhold, Roy suggested during the interview that he was forced out of the marital residence, that he did not have any income, and that Rosie had cut him off financially. Roy stated that he went to Devin's residence to get a plate of food earlier that evening. Initially, Roy stated that he left

4

around 6:30 or 7:00 p.m., and later he stated that he returned home around 8:00 or 8:30 p.m. According to Sergeant Rockhold, Roy mentioned that when he returned home, an NFL football game was not even at halftime and that the score was 20 to 0. However, Sergeant Rockhold testified that it was not until well into the third quarter when the score became 21 to 0. Additionally, Roy stated that a friend had called him and told him that he was a suspect in the shooting. Sergeant Rockhold noted that when he spoke with Roy over the phone, Roy acted like he did not have any knowledge of what was going on.

¶11. According to Sergeant Rockhold, Roy stated that he had not been to the marital residence that evening. However, Sergeant Rockhold testified that Roy was asked, "So you won't be on any cameras over there?" and he responded, "I hope not." Then Roy was asked again, "And you are not on that camera?" and he responded, "I hope I'm not. I don't know." According to Sergeant Rockhold, Roy acknowledged that he owned two 12-gauge shotguns. Although Roy stated that the last time he had fired a gun was years earlier, Roy's face, hands, and clothing were swabbed for gunshot residue (GSR), and the swabs were sent to the Mississippi Forensics Laboratory for testing.

¶12. Approximately two days after the shooting, law enforcement received a tip that Devin was in possession of a shotgun. Devin testified that he believed that his friend Roberts had arranged to return the shotgun to him so that he could be arrested with it. After receiving the tip, law enforcement did in fact arrest Devin for being a felon in possession of a firearm. At the time of his arrest, Devin yelled, "You got my daddy's gun."

¶13. Devin did not realize that at least one officer's body camera was recording him when

he mentioned that the shotgun belonged to his father, and he subsequently lied to law enforcement in an attempt to protect Roy. Devin testified that he initially told law enforcement that he found the shotgun in the trunk of his vehicle and did not know whom it belonged to. He testified that he later acknowledged that the shotgun belonged to Roy but still tried to protect him by not disclosing that Roy had given it to him. Seemingly after Devin was released from incarceration, he decided that he did not want to protect Roy anymore and gave another statement in which he acknowledged that Roy had given him the gun. This statement was consistent with his testimony at Roy's trial.[4]

¶14. Lori Beall, a forensic scientist with the Mississippi Forensics Laboratory, testified as an expert in the area of firearm forensics. According to Beall, the pellets recovered from the marital residence after the shooting were mutilated; therefore, she could not identify or classify them. However, she determined that the "wadding" that was recovered from the scene was consistent with 12-gauge plastic wads and could have been shot out of a shotgun.

¶15. Chad Suggs, another forensic scientist, testified as an expert in trace evidence after analyzing the GSR swabs that were submitted to the Mississippi Forensics Laboratory. Suggs explained that a positive GSR particle contained lead, barium, and antimony in a single round particle. Further, a positive GSR particle meant that a person discharged a firearm, handled something with GSR on it, or was in close proximity to a discharged

---

[4] Devin gave statements to law enforcement on September 26, 2017; October 14, 2019; October 17, 2019; and May 14, 2021. The record indicates that Devin pled guilty to possession of a weapon by a felon and was sentenced to ten years in the custody of the Mississippi Department of Corrections, with eight years suspended and two years to serve, followed by a period of post-release supervision. One of the conditions of his post-release supervision was to provide truthful testimony at trial.

firearm. Additionally, Suggs explained that particles indicative of GSR may not contain all three elements and may not be round particles. According to Suggs, one positive particle was identified on Roy's T-shirt and several particles indicative of GSR were found on his body and clothing.

¶16. Finally, Sergeant Rockhold testified that he used Cellebrite, an advanced technology, to recover deleted searches from Roy's cell phone. According to Sergeant Rockhold, on September 19, 2017—five days before the shooting—the following searches were conducted: "what kind of shotgun shells for home defense," "does the surviving spouse receive social security," and "does the spouse of a retired disabled soldier get a spouse check." Then on September 21, 2017—three days before the shooting—the following search was conducted: "grants for disabled people." Sergeant Rockhold also recovered a search regarding which team won the football game that was played on the night of the shooting.

¶17. After the State rested its case, Roy moved for a directed verdict, which was denied. Then the defense rested without calling any witnesses. After considering the evidence presented at trial, the jury convicted Roy of aggravated domestic violence. Roy filed a motion for judgment notwithstanding the verdict or a new trial, which the circuit court denied. Now Roy appeals, challenging the sufficiency and weight of the evidence.

## DISCUSSION

### I.    Sufficiency of the Evidence

¶18. "A criminal defendant has several procedural vehicles available to him for challenging the sufficiency of the evidence." *Russell v. State*, 296 So. 3d 217, 223 (¶16) (Miss. Ct. App.

7

2020) (quoting *Myles v. State*, 774 So. 2d 486, 490 (¶15) (Miss. Ct. App. 2000)). "A challenge to the sufficiency of the evidence 'can be raised in a motion for directed verdict made at the end of the case for the prosecution, a request for a peremptory instruction at the end of all of the evidence or the motion for a directed verdict at that point, or finally, a motion for judgment of acquittal notwithstanding the verdict.'" *Id*. (quoting *Myles*, 774 So. 2d at 491 (¶15)). "When the sufficiency of the evidence is challenged on appeal, we review the circuit court's ruling on the last occasion when the sufficiency of the evidence was challenged before the trial court." *Id*. In this case, Roy filed an unsuccessful post-trial motion challenging the sufficiency and weight of the evidence.

¶19. "When reviewing a challenge to the sufficiency of the evidence, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id*. at (¶17) (quoting *Reynolds v. State*, 227 So. 3d 428, 436 (¶32) (Miss. Ct. App. 2017)). "The issue on appeal is not whether the reviewing court would have found the defendant guilty; rather, the conviction must be affirmed if there was sufficient evidence for 'any rational trier of fact' to have rendered a guilty verdict." *Id*.

¶20. To obtain a conviction for aggravated domestic violence, the State had to prove that Roy attempted to cause or purposely or knowingly caused bodily injury to his wife, Rosie, with a deadly weapon, specifically a shotgun. Miss. Code Ann. § 97-3-7(4)(a)(ii) (Supp. 2016).

¶21. At trial, the State presented evidence that the shooting occurred at 7:57 p.m. Roy's

8

ex-girlfriend testified that she thought she saw Roy's vehicle in Palmer's Crossing between 8:00 and 8:30 p.m. that evening. Despite Roy's claim that he had not left his apartment, surveillance footage showed a vehicle matching the description of his vehicle driving away from his apartment at 7:22 p.m. and then driving toward his apartment at 8:24 p.m.

¶22. Additionally, Devin testified that on the night of the shooting, his father (Roy) gave him a brown Ithaca shotgun and instructed him to "[g]et rid of it." After following Roy's instructions, Devin learned that Rosie had been shot. He testified that when he questioned Roy about the shooting, Roy responded, "I did what I had to do."

¶23. According to Sergeant Rockhold, Roy acted like he did not have any knowledge of the shooting when he spoke with him over the telephone but later stated during an interview that a friend had called him and told him that he was a suspect in the shooting. Additionally, Roy stated that he had not been to the marital residence that evening, but when asked if he would be on any surveillance footage, he responded, "I hope I'm not. I don't know."

¶24. Rosie indicated that Roy's motive for shooting her was financial and explained that he would inherit the marital residence in the event of her death and receive a Death Gratuity Benefit in the amount of $100,000. Additionally, law enforcement recovered the following deleted searches from Roy's cell phone: "what kind of shotgun shells for home defense," "does the surviving spouse receive social security," "does the spouse of a retired disabled soldier get a spouse check," and "grants for disabled people." A search was also conducted regarding the NFL football game that was played on the night of the shooting.

¶25. Finally, an expert in trace evidence testified that a positive GSR particle was identified

9

on Roy's T-shirt, which meant that he had discharged a firearm, handled something with GSR on it, or was in close proximity to a discharged firearm. Further, several particles indicative of GSR were found on Roy's body and clothing.

¶26. Roy argues that all the evidence was circumstantial and that the jury had to speculate to convict him. However, this Court has held that "a conviction may be had on circumstantial evidence alone." *See McCray v. State*, 263 So. 3d 1021, 1028 (¶19) (Miss. Ct. App. 2018). Additionally, "all the proof need not be direct and the jury may draw any reasonable inferences from all the evidence in the case." *See Walker v. State*, 21 So. 3d 663, 669 (¶10) (Miss. Ct. App. 2009).

¶27. Although Roy suggests that certain evidence taken alone did not establish his guilt, we find that after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

## II. Weight of the Evidence

¶28. "In reviewing the denial of a motion for a new trial based on an objection to the weight of the evidence, this Court will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Grace v. State*, 281 So. 3d 986, 992 (¶18) (Miss. Ct. App. 2019) (quoting *Kirk v. State*, 160 So. 3d 685, 697 (¶31) (Miss. 2015)). "The evidence is weighed in the light most favorable to the verdict." *Id*. "We do not reweigh evidence. We do not assess the witnesses' credibility. And we do not resolve conflicts between evidence. Those

decisions belong solely to the jury." *Thompson v. State*, 302 So. 3d 1230, 1234 (¶11) (Miss. Ct. App. 2020) (quoting *Little v. State*, 233 So. 3d 288, 289 (¶1) (Miss. 2017)).

¶29.    Roy suggests that Devin's testimony was not credible because he was a former gang member, he had been convicted of a felony, and he had changed his story. At trial, evidence was presented that Devin yelled, "You got my daddy's gun," at the time of his arrest. Devin testified that he did not realize that at least one officer's body camera was recording him when he mentioned that the shotgun belonged to his father, and Devin subsequently lied to law enforcement in an attempt to protect Roy. As stated, this Court does not assess the witnesses' credibility. *Id*. That responsibility belongs to the jury. *Id*.

¶30.    Further, Roy argues that the GSR in this case only established that he came in contact with GSR or was in an area where a gun was fired. However, the expert in trace evidence testified that a positive GSR particle was found on Roy's T-shirt, which meant that he discharged a firearm, handled something with GSR on it, or was in close proximity to a discharged firearm. The jury weighed this evidence, and as stated, this Court does not reweigh evidence. *Id*.

¶31.    After review, we cannot say that the jury's verdict was "so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Grace*, 281 So. 3d at 992 (¶18).

¶32.    **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**

11